The Summary Judgment of Non-Infringement here cannot stand for two reasons. First, the District Court erred by importing the Basic Pond Limitation into Claim 16. And second, even under the District Court's instruction, PICTOMETRY infringes the Asserted Claims because it, in fact, uses multiple images to determine location. With respect to Claim 16, the evidence supporting our construction is really in three places. First, the plain language is broad enough to cover the use of single-ray projection method. Second, we disclose the single-ray projection method at Columns 25 and Figure 8 of the Act. And third, in the Prosecution History at 2779, we confirm that the present invention includes the ability to do single-ray projection method. If you combine those three sources of evidence supporting our construction and compare it to the evidence that PICTOMETRY relies on for a disclaimer, what you find is the disclaimer theory doesn't wash. It doesn't add up to enough to overcome what we expressly said in the specification. Back to nothing but talking about the plain language. The plain language says that the object must be shown in at least two images, as PICTOMETRY pointed out repeatedly on Summary Judgment. They said, quote, All that Claim 16 requires is that the object whose location is to be determined be shown in the second image, end quote. That's at 2570. And we agree. The plain language doesn't continue on to say that it must be based upon more than one image, or that it has to use multiple images. But that's really the best evidence supporting our constructions in the specification itself. Via the Columns 10 and 11 of Figure 8, we undeniably disclose single-ray projection method. And we know that for two reasons. First, PICTOMETRY acknowledges that single-ray projection method is a method for determining location. In fact, it's a method they claim to use. And second, their own expert, when asked on his deposition, does Figure 8 disclose single-ray projection method, answered yes. That's at 82867 minus 2325. You put those together, and the only conclusion you can reach about Columns 10 and 11 of Figure 8 is that they are, in fact, disclosing a single-ray projection method. And the District Court, at least initially, acknowledged that. On page 837 in her Summary Judgment Opinion, she stated, quote, Indeed, the TAP specification clearly shows how to determine the relative location of a street center line based on its position in only one image, using the same mathematical calculation that PICTOMETRY uses to determine object locations in its aerial photogrammetry process. End quote. Now, the prosecution history is really where this fight has come down to. But I think the critical page in the prosecution history that the Court should look at is 2779. Because on that page, we mention the instantaneous association of spatial position and orientation data with recorded images as they're recorded is a key feature of the invention. In fact, we said, quote, It is this feature of the present invention which allows a wide range of functions which are neither taught nor suggested nor possible with the system described in Basler at all. And we went on to distinguish our multiple image embodiment from Basler's use of multiple images, because Basler undeniably uses multiple images to determine location. And then continued in the last paragraph to say, in addition, the present invention also can be used to do a number of things, including locate center lines of streets, which is the street center line determination. PICTOMETRY has never argued that that language on 2779 refers to anything else. So what you have is a specific embodiment. You have prosecution history confirming that embodiment. The argument is... One question, if I could, please. At pages 31 through 32 of the PICTOMETRY brief, the red brief, the PICTOMETRY marshals a number of sites from the specification, which would suggest that you require two images. However, it does, in each case, use the word allows. Is it your argument that the use of the word allows or the word allowing at those places is what gets you off the hook from those statements? Because they seem fairly strong. For example, the first one says, because the INS inertial navigation system provides six-dimensional spatial position information, the present invention allows the location of a point to be accurately determined from any two video images. And the others are along the same line. And that seems to provide some fairly significant support for their position. But I thought, in your brief, you seem to focus on the word allows, suggesting that this was just an option. Is that your position in response to those sites? That is our position, Your Honor. The word allows there is talking about embodiment of the invention. And that's in columns 15 and 16, which is specifically talking about our multiple image embodiment. And we distinguish that not only in the specification, but in the prosecution history as being different from Basler's use of multiple images. And if I could back up a second. The reason why it's important is because Basler, to use multiple images, requires that they substantially overlap to provide any kind of surveying function. What we're saying in 15 and 16 is, we can do the same things Basler can do with any two images. But that's not saying that we can't do what we say we can do in columns 10 and 11, which is singularity projection method. This is distinguishing a specific embodiment from the prior art. And I think you're right, folks. The word allows is the key word there, as it is during the prosecution history. And so I think the key part to look at is comparing 10 and 11 to 15 and 16 and say, is there anything in 15 and 16 that says, although we say you can do specific, I'm sorry, singularity projection method, we didn't really mean it. The way you do it is over here in columns 15 and 16. There's nothing like that in this fact. So, Your Honor, with regards to claim 16, we believe that the construction issue requires reversal. And as pictometry has conceded, assuming that you uphold traditional court constructions of moving platform and video camera, that they conceded under our construction that there's infringement, we ask that you reverse on claim 16, remand for entry of summary judgment in our favor. The second reason for reversal relates to pictometry's use of multiple images. Even applying the Bayes Compound Limitation Claims... This is a tie-pointing again? This is a tie-pointing, yes. And I want to address that just briefly. The idea of tie-pointing being the infringing act. The question here isn't whether tie-pointing infringes or doesn't infringe, whether pictometry infringes or doesn't infringe. The fight to... Your Honor, if you accept the district court's claim construction on claim, tie-pointing is the only way you could get infringement on claim 1, right? That's correct. We're not challenging the district court's claim construction on claim 1. And if you adopt the district court's construction on 16, 1 and 16 have largely the same analysis because they admit the other... And then you rely on the tie-pointing. Correct. And so... Wasn't tie-pointing only a quality control measure rather than a method of determining location? Well, Your Honor, I think the easy answer there is it doesn't matter whether it's quality control or post-production or it's initial production. It's determining location. There's nothing about our claim that says quality control falls outside of its scope. Or there's nothing about method claims in particular that says quality control can get you around otherwise valid patent. And so I think the key is to focus on what they're doing rather than what they call. What they're doing is taking images with initial geographic locations. That's their phrase. That's from the reply brief in summary judgment. Initial geographic locations. They subject it to a process going from your left to your right wherein they either accept, change, or reject the locations. And that process itself meets the determining location steps in claims 1 and 16. It doesn't matter whether it's purely for quality control or that they only subject some of the images because those images stand in for the whole set. In fact, I think it's undisputed that if they reject the locations in the images, i.e. they fail high pointing multiple times, they throw out all 4,200 or 4,300 images and start over. And so this process that they go through on every single project and subject every single image to is itself determining location under the scope of the claims. And I'm not sure if there are any questions I'll reserve for the remainder of the time. No, we'll save your rebuttal time. Thank you. Mr. Titterington. Mr. Court, my name is Joseph Titterington for the Atometry. Your Honor, in addressing what Mr. Perebrand said, I'd like to first reiterate a finding of the beholding of the recent case of retractable technologies. Mr. Court stated that we strive to tether the claims to the written description. That is the goal of claim construction, is to give the inventor the scope of what he or she invented regardless of the breadth of the claims. Now, with regard to Claim 16, undisputedly the claim reads that the images must be shown in. Shown in, two images. To argue that Claim 16 therefore permits the determining of location in a single image would render that particular element of the claim meaningless because a single ray projection would not require that the image be shown in a second image. And so, what you've picked on, or what GSBAN is asking you to read out of Claim 16, that particular element. And I believe that is inappropriate because that would render that particular element surplusage. And while that is an element which need not always be recognized, it is one which certainly should be recognized in this instance because it is the whole point of that final element. If you read that element shown in out of that, if you read shown in out of the final element of Claim 16, it might as well not be there at all. The whole element serves no purpose. Now, Judge Shaw, you've indicated in fact that they point out on numerous occasions that the present invention talks about allowing the use of two images to determine the location of an object. What does it mean to determine the location of an object versus how many images does it take to determine the location of an object? Determining the location means determining the geographic location, the spatial location of that object. It's latitude, longitude, and elevation. Now, that has implications for type learning, which has no claim that serves no purpose in determining the actual location of an object. But in terms of Claim 16, if you look at each throughout the claim, there is only the discussion of the use of two images. At no time do they discuss that the photogrammetric method that they claim can be performed using a single image. The street centerline process, as Judge Montgomery found, was used solely to create street segments, which is an entirely different component of this invention. It's found in Claims 9. Claims 1 through 8 deal with determining the location, assigning the geographic coordinates to an object in an image. Then, Claim 9 adds the element of creating street segments. Now, Claim 9 depends from Claim 1, and they have conceded that Claim 1 requires the actual use of two images. That is, you have to perform triangulation, locate the object in each of the images, perform triangulation, and determine the geographic location of that object. Now, Claim 9 then, adding street segments, is the first time we see introduced the notion that this street centerline process has some role in this act. So, to say that Claim 1, or that any claim that is talking about determining the location of an object, permits the use of single-brain projection, would then cause into question, then, what is Claim 9 all about? If Claim 9 adds street segments, and the street centerline determination is used for determining street segments, then what role does it play in Claim 1? None. None. It has nothing to do with that. There is nothing in this patent that suggests that the street centerline determination was ever considered by the inventors as part of the method by which you determine the location of an object for purposes of photogrammetry. Now, we can see that. Not only are there the instances that are throughout the patent, but we can see that in the prosecution history of the patent. The examiner rejected this claim, the claims that all of the plaintiffs had, in view of a reference referred to as Mosler. Now, Mosler was a band that had two cameras mounted on top, pointed in the same direction. In other words, the cameras were oriented in the same geometric plane, pointing in the same direction. And the examiner rejected all of the claims of the patent, in view of that reference. The DS band came back and argued, well, wait a second, Mosler shows an example of stereo photogrammetry, and we don't use stereo photogrammetry. Stereo photogrammetry, according to the DS band, which is not as stereo photogrammetry as it appears in the art, but stereo photogrammetry, according to the DS band, is simply where two cameras lay in the same geometric plane, capturing simultaneous images, where the cameras are pointed in the same direction. In the art, stereo photogrammetry includes much more than that. But, getting back to the prosecution history, in arguing in their response to that rejection, Geospan added amended claims and added new claim 71, which is currently claim 16 of the patent. And in their argument, in arguing for allowance of the claim, This is the discussion at 2620 through 23 of the? Yes, Your Honor. Yes, Your Honor. And therein, on page 2621, Geospan stated, With the present invention, the location of an object is shown in at least two of the recorded non-coplanar video images, which were obtained at different times, can be determined. The determination of location of the object is based upon the location of the object in each of the recorded images and the associated spatial position and orientation of the camera producing each of those video images at the time when the image was obtained. Now, there's nothing in there that is permissive. There is nothing in there that suggests it's just one way of looking at it. It are simple declarative statements of the fact of what the inventors believed their invention was. And they should be held to that. Counsel, I want to ask you a little bit about your cross-appeal on validity. You've sort of thrown five references at us, obviously the district court, which seems to me to be a shotgun kind of approach, suggesting that none of them are really on point. Let me ask you specifically about the EOP reference. The district court said this, said about this and the others, that they rely on stereophotogrammetry. So, what's the basis for your argument about the EOP reference? Well, the EOP reference, Your Honor, I believe, clearly shows, undercuts the whole inventive concept of this patent. The whole inventive concept of this patent is the idea that stereophotogrammetry is limited to a situation in which you have two cameras on the same geometric plane capturing simultaneous images with cameras pointed in the same direction. And yet the EOP reference clearly shows that the notion of non-coplanar photogrammetry, which is a situation which they define in which the axis of the cameras are pointed in different, sometimes even opposite directions, is somehow new in the art. And that's what they lay their claim to for the invention. Yet, if you examine Figure 17.3 or Dash 3, which is on A3912, you'll see quite clearly that Woolf, in the elements of photogrammetry, in 1983 was showing an example of what he produced and must admit is non-coplanar photogrammetry. Is that because the lines indicating forward exposure, or different angles? That is it, Your Honor. And if you look at page 3911, you'll see that the text of the book, which teaches that convergent photography consists of stereo pairs of low oblique photos taken with camera axes converging towards one another. So you're saying that one sentence invalidates the patent. I'm saying that this disclosure undercuts the whole notion that the use of non-coplanar photogrammetry was somehow new to the art. That is the invented concept underlining this particular patent. If I could, Your Honor, in the time remaining, let me ask you, Judge Lurie has raised the question of the cross-appeal. Let me ask you, obviously, if we were to agree with Mr. Fairbairn, you would want us to proceed with the cross-appeal if we agreed with him on the infringement issue. Correct. Assume for the moment we were to affirm the district court on the infringement issue. In other words, say, judgment of non-infringement affirmed. Would it still be necessary? Would you still want us to go ahead with the cross-appeal on all the issues? Well, I think part of that is conditional cross-appeal on the moving platform and the video cameras. Obviously, if you affirm, there would be no reason to consider those issues. Okay. What about the other issues? You have an enablement, you've got the validity issue, and then you've got the inequitable conduct claim. Correct. On the horse trade, one for the other. If I got an affirmance, I'd probably be happy with that, and I don't know that it would be necessary for the court to consider those other two issues. Certainly, I don't know. I think the panel may be aware of the fact that the PTO has recently held that claims 116 are invalid, and a reexamination certificate will issue in due time to that effect. On the inequitable conduct issue, I do believe that the court improperly dismissed it with prejudice. Judge Montgomery did not grant summary judgment against this. She simply held it in light of her finding of non-infringement that the issue was moot. We do believe we ought to have the right to pursue that. If necessary. If necessary. So you're saying if we affirm the judgment of non-infringement, there would be no need to reach the enablement and validity issues, but you still would have a concern about the inequitable conduct, the dismissal of that with prejudice. You're saying it should be without prejudice. Correct. Okay. Likewise, in case they come after you with a different product? On the reexamination plan, yes. Thank you, Your Honor. We'll get to that in the application. I do save some time for rebuttal on the cross-appeal if we get to it. Thank you, Your Honor. We'll start with a couple of questions about the infringement side. First is this argument about the surplus. I think it's important to remember that Claim 16, under our view, covers multiple embodiments, not just singularity of projection, but also the use of multiple images. So the non-coplainer language doesn't become functionally meaningless if you find that another embodiment is also covered by the claim because it undeniably covers the multiple image embodiment. And besides, the non-coplainer language is actually from an earlier step in the claim that's already a limitation in the claim in Step 6. So the idea that it's surplusage because another embodiment doesn't cover it is clearly wrong. Second is this argument that the singularity of projection method only goes to Claims 9 and 11. And that fails for a few reasons. First, there's nothing in the specification that links the singularity of projection method in Counts 10 and 11 to Claims 9 through 11. And moreover, it's internally inconsistent because the district court already found that Claim 1 requires the use of multiple images. Claim 9 through 11 are dependent back to 1. And so if Claim 9 through 11 requires the use of singularity of projection method, it's inconsistent with the construction of Claim 1, which requires multiple images. Regarding the prosecution history involved in Basler and the statements in the Third Amendment at 2620 and 23, I think you need to remember there that what's happening in that amendment is we're distinguishing Basler, which undeniably is a multiple image disclosure, from our multiple image embodiment. And so it's just like on that page that I cited earlier, 2779, where we first say our invention allows a number of things, such as multiple image embodiments, and that also allows singularity of projection method. We only talk about singularity in that page in reference to the multiple image embodiment. That's what we're distinguishing in the Third Amendment. And so all of that language is talking about that embodiment being different from Basler because Basler requires overlapping images. We don't require overlapping images. We can use any two. So that's what that's talking about. If I could address the validity question quickly. You're right, Brown, that this is a shotgun approach to obviousness, and what the questions about EOP illustrate is the problem with that. The test here is whether any one of these limitations, I'm sorry, any one of these references, combined or alone, disclose all of the elements. EOP doesn't. If you look at their claim charts at 41, 34, and 52 on EOP, you'll notice that they don't argue that EOP discloses the second or third steps of Claim 1 or the second through sixth steps of Claim 16, nor 3, 4, or 7. In fact, there's been no argument about 3, 4, or 7 in this entire appeal. What about the sentence on A3911, single aerial camera can also be used. Is that... I'm sorry. Single aerial cameras can also be used for taking convergent photos, which Mr. Titterington says weakens the idea that this is a stereoscopic image. Well, I think the key point there is Mr. Titterington never said that EOP is not stereoprogrammetry. It is. It is that EOP discloses stereoprogrammetry. I think the key here is all of these elements, or all of these references, use stereoprogrammetry to determine location. The district court correctly found that they all do and found that our patent excludes it. And that's right... Sorry. Our specification and prosecution history is ripe with references to disclaiming stereoprogrammetry. For example, Column 16, Lines 18 to 20, we specifically said that our invention was a significant improvement over stereoprogrammetry. Mr. Chairman, let me ask you on the inequitable conduct claim. I think in the briefs, both parties do seem to agree that the district court didn't reach it, ruled on mootness, and dismissed with prejudice, and that, in fact, the dismissal should have been without prejudice under those circumstances. So, whatever we do, don't we really have to just vacate that ruling? I mean, both parties agree that the judge dismissed for mootness and that it should have been without prejudice. No, Your Honor, because you have to remember we moved for summary judgment on inequitable conduct. We wanted a summary judgment. Right, because we know the judge hasn't addressed it. We can't rule on it. Well, I think you can, though, in part, Mr. Finneran raised the re-examination. First of all, I want to clear up, the Patent Office didn't find our claims invalid. It actually found patentable subject matter over the years. No, but we couldn't. I don't see how we could at this point. But you agree the dismissal with prejudice was incorrect. The way the district court did it was. We would have asked for a dismissal of prejudice on the merits. Yeah, but the point is, the judge never ruled on the merits. He never said, he never ruled in favor of Mr. Tittering's position, and he never ruled in favor of your position. So, we couldn't. I don't see how we could step in on an inequitable conduct issue as an appellate court and rule on the merits. Your Honor, I understand. Ultimately, we don't think it's going to matter because the Patent Office allowed claims over the GeoVan reference that they rely on. So, even if you dismissed it without prejudice and sent it back to the district court, ultimately, we think that's going to end their inequitable conduct challenge. We'll have to take it up because we also heard your opponent say that he was content to let that go if, in fact, there is an affirmance on the merits and we haven't gotten to that point either way. Thank you, Your Honor. I see my time is up. Yes, we also have another appeal now. Mr. Tittering, you saved some time for rebuttal on your cross-appeal. Is there anything that you need to say in response to what Mr. Fairburn told us? I don't believe there is. Okay. Thank you. And we'll move this appeal under... Can they stay in their seats? Yes. Yes, there's no need to change it. We'll take up the next appeal. We'll ascertain what's left.